**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| v. | * | Crim. No. SAG-05-0147 |
| | * | |
| SHAWN HENRY, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Shawn Henry, who is presently in Bureau of Prisons custody at FCI Fort Dix, has filed a Motion for Imposition of a Reduced Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). ECF 58. The Government filed an opposition, ECF 66, and Henry has replied, ECF 68. For the reasons that follow, Henry's Motion must be denied.

## I.     Factual Background

The following facts are derived from the statement of facts proffered and agreed at Henry's guilty plea proceeding. ECF 50 at 17-19. On February 7, 2005, Henry was one of several defendants scheduled to commence trial in Case Number JFM-04-04 for federal drug trafficking crimes, crimes of violence, and firearm offenses. *Id.* Prior to the trial date, the government provided discovery materials pertaining to a government cooperating witness ("the witness"), who was a federal inmate and a member of a rival gang. *Id.* The discovery materials provided by the government included transcripts of two official proceedings in which the witness's testimony had implicated Henry and his co-defendants in drug trafficking and acts of violence. *Id.* In addition, in the course of jury selection, the witness's name appeared on the government's proposed witness list and was announced in open court. *Id.*

After a jury was selected, Henry entered a guilty plea to Count One of the second superseding indictment in JFM-04-04, as did his co-defendants Tyrell Fields and Dante Faulkner. *Id.* Following the rearraignment proceedings, which concluded about 6:30 p.m., Henry, Fields, and Faulkner, all of whom were in custody, were transported by the U.S. Marshal to Maryland Reception Diagnostic and Classification Center ("MRDCC"), pending their return to the respective state or federal institutions from which they had been transported for court. *Id.* Upon their arrival at MRDCC at about 7:00 p.m., they were placed in a group holding cell where Henry, Fields, and Faulkner encountered the witness, who had been transported that day from the Federal Bureau of Prisons for the purpose of testifying for the government in the anticipated trial in JFM-04-04. *Id.* Upon encountering the witness, Henry, Fields, and Faulkner confronted him with the fact he had been named in their court papers and was there to testify against them.[1] *Id.* The witness denied this, at which point Henry, Fields, and Faulkner assaulted the witness, knocked him to the floor, and punched him and kicked him in the face, head, and body, until they were stopped by correctional personnel who observed the assault. *Id.* The witness had also provided testimony implicating other co-defendants in Case Number JFM-04-04, who had not yet been apprehended at the time of the assault. *Id.*

---

[1] While not part of the statement of facts provided to Judge Motz at Henry's rearraignment, the parties appear to agree that the witness had participated in the homicide of Henry's children's mother during a period of intense, retaliatory violence between the two rival gangs. Henry attributes his attack on the witness to a desire to avenge the murder as opposed to an effort at witness tampering. That argument did not persuade Judge Motz at Henry's sentencing, as he expressed his understanding that the witness had been involved in the murder but said, "There's some things which the system just can't tolerate. And it can't tolerate people going into holding cells and beating up government witnesses . . . . So understanding your subjective motivations, finally, your objective conduct requires me to impose the sentence." ECF 51 (sentencing transcript) at 21.

Henry received a sentence of 314 months in federal custody for his conduct in JFM-04-04. That sentence was later reduced to 246 months.  JFM-04-04, ECF 233, 246.  In the instant witness tampering case, Henry agreed to a Rule 11(C)(1)(c) plea under which the parties agreed that the appropriate sentence should be within the guideline range as determined by Judge Motz.  ECF 58 at 4.   They acknowledged that, depending on Judge Motz's decision with respect to the applicability of a particular cross-reference in the sentencing guidelines, Henry's applicable guideline range would be either 70 to 87 months (if the cross-reference applied) or 30 to 37 months (if it did not).  ECF 66 at 5.

On February 13, 2006, Faulkner and Fields were each sentenced in this witness tampering case, JFM-05-147, to 60 months' imprisonment, to run consecutive to their respective sentences in JFM-04-04.  ECF 58 at 5.  Henry's witness tampering sentencing was almost two months later, on April 7, 2016.  At Henry's sentencing hearing, Judge Motz heard arguments from counsel and determined that the disputed cross-reference should apply, making Henry's guideline range 70 to 87 months. ECF 51 at 16-17.  Henry's counsel then argued that "the two codefendants in this offense, who, in fact, were the ones that initiated this and made the statements about him being a witness, received 60-month sentences," suggesting that an 87-month sentence for Henry would be disproportionate.  *Id.* at 23.  Judge Motz responded that, "Maybe I under-sentenced them . . . But I know where I am today.. . . And I could do 70.  I could be absolutely comfortable and do something in between.  . . . And when somebody comes into this court and pleads guilty and goes out an hour later and beats up a witness, for reasons of general deterrence and justice I'm imposing the maximum sentence available."  *Id.* at 23-24.  He continued, "And that's what you bargained for.  Whether or not I would have applied that strictly under 3553, so be it."  *Id.* at 24.

Henry now seeks to reduce his sentence of 87 months to a sentence of 60 months to match the sentences of Fields and Faulkner.  ECF 58.  He notes that he has essentially completed service of his 246-month sentence in JFM-04-04 and is now commencing service of the witness tampering sentence.  *Id.* at 5-6.

## II.   Analysis

The Government does not contest Henry's exhaustion of his administrative remedies.  *See* ECF 66 at 11.  Thus, this Court turns to the three-step inquiry enumerated under § 3582(c)(1)(A), beginning with whether Henry has established any "extraordinary and compelling reason[]" warranting further consideration of compassionate release.  Under § 3582(c)(1)(A), a court may reduce a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction[,]" and the defendant has exhausted his administrative remedies.  The Fourth Circuit has held that "district courts are 'empowered . . . to consider *any* extraordinary and compelling reason for release that a defendant might raise.'"  *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020) (quoting *United States v. Zullo*, 976 F.3d 228, 230 (2d Cir. 2020)).

Henry argues essentially three factors that in his view, individually and collectively, amount to an "extraordinary and compelling" reason his release should be considered:  an unwarranted sentencing disparity with his co-defendants, his susceptibility to severe COVID-19, and his rehabilitation.  This Court considers those three reasons below.

### A.

First, Henry argues that he is subject to an unwarranted sentencing disparity because he received a sentence that is 27 months longer than Faulkner and Fields, who committed the same criminal act of witness tampering.  His argument starkly illustrates the tension between the traditional principles of finality of sentencing and the developing law in the compassionate release

context, which inherently undermines that finality. While the compassionate release framework is meant to provide a "safety valve" to reduce an otherwise-final sentence if there is an "extraordinary and compelling" reason to do so, it is not meant to provide movants with an opportunity to simply relitigate their sentencings. Ultimately, after weighing the relevant concerns, this Court concludes that Henry's circumstance does not amount to an "extraordinary and compelling" disparity justifying consideration of compassionate release.

At the time of Henry's sentencing in 2006, Judge Motz calculated the applicable guideline range and then imposed a within-guidelines sentence in accordance with the parties' binding Rule 11(C)(1)(c) plea agreement. ECF 51. As noted above, during the sentencing itself, Henry's counsel argued that an 87-month sentence would create a sentencing disparity with his two co-defendants who had received just 60 months. *Id.* at 23. Nevertheless, after weighing all of the relevant factors, including the terms of the parties' plea agreement, Judge Motz decided to impose a guidelines sentence and in fact intentionally selected the high end of the guideline range, creating a larger disparity than would have been created had he imposed a 70-month sentence.

Henry now essentially asks this Court to consider his sentence anew – to re-sentence Henry in accordance with this Court's view of the case. It is true, as with every sentencing, that reasonable judges could disagree about the most appropriate sentence to impose upon an individual defendant. It is also true that the individualized inquiry required by 18 U.S.C. § 3553 often results in different defendants receiving different sentences for identical or very similar conduct. Sometimes the defendants have disparate criminal histories. Sometimes a judge reacts positively or negatively to something an attorney or a defendant says in the courtroom. Sometimes, as in this

case, one defendant reaches a plea agreement that varies from the other defendants'.[2]  Sentencing is intended to be highly individualized and is not intended to be a one-size-fits-all approach.  Thus, the fact of a "sentencing disparity" itself is not automatically "extraordinary and compelling." Rather, for purposes of a motion for compassionate release, the disparity must create an "extraordinary and compelling" reason for relief. But absent some other defect in the sentencing process, there is nothing "extraordinary and compelling" about a sentencing judge intentionally imposing a disparate sentence when the judge thinks such a sentence is warranted under § 3553(a).

Henry cites a series of cases in which sentencing disparities constituted or played a part in what judges deemed an "extraordinary and compelling" reason justifying consideration of compassionate release.  ECF 58 at 9-10.  Those cases, however, are generally distinguishable in important ways.  In several of the cases, significant sentencing disparities arose years after the defendant's original sentencing, because the co-defendants' sentences were reduced for compassionate release or for other reasons. *See, e.g.*, *United States v. Payton*, Crim. No. PJM-06-341, 2021 WL 927631, at *2 (D. Md. Mar. 11, 2021); *United States v. Stockton*, Crim No. ELH-99-352, 2021 WL 1060347, at *14 (D. Md. Mar. 17, 2021).  In another highly unusual case, a defendant who had been sentenced early among a long list of co-conspirators ended up with a sentence that exceeded his co-conspirators' sentences, even after the sentencing judge had expressed his desire at sentencing to avoid disparate sentences among the co-conspirators. *United States v. Eccleston*, --- F. Supp. 3d ----, 2021 WL 5506754, at *4 (D. Md. Nov. 24, 2021).

---

[2] The terms of Henry's plea agreement would not have permitted Judge Motz to impose the same 60-month sentence he gave to Henry's co-defendants, and that Henry asks for here.  Henry's plea agreement required Judge Motz to impose a sentence within one of two ranges: 70 to 87 months or 30 to 37 months, depending on whether a particular cross-reference applied.  The plea agreements entered by his co-defendants necessarily had a different structure because they resulted in 60-month sentences.  "Buyer's remorse" over plea terms is not an unusual, or an "extraordinary and compelling," situation.

Accordingly, years-later when the defendant moved for compassionate release, the sentencing judge (who had since retired from the bench) affirmatively supported his request and recognized that the sentence he had originally imposed "may be at odds with my stated desire to avoid sentencing disparity in this case." *Id.* None of those cases presented an issue like the one presented here: where a defendant seeks straight reconsideration of a known and intentionally imposed disparity already presented to, and considered by, the sentencing judge at the time of the original sentencing.

Again, Henry's contention that his sentence, viewed in a vacuum, should have been the same as his co-defendants' sentences is a reasonable position with which some judges might readily agree. But his sentencing judge considered the fact that he was imposing a disparate sentence and decided that Henry's sentence was warranted despite that disparity. To alter that sentence now simply because the original sentencing judge has left the bench would not only conflict with the principle of finality in sentencing, but it would require this Court to revisit the same facts and arguments Judge Motz considered in the first instance and then substitute its own view of the sentence Henry should have received for the one Judge Motz actually imposed. In the circumstances of this case, the sentencing disparity on which Henry relies is not an "extraordinary and compelling" reason to revisit Judge Motz's express determination of the appropriate sentence.

**B.**

Henry's next argument is that his health conditions, in the context of the COVID-19 pandemic, amount to an "extraordinary and compelling reason[]" justifying his earlier release.[3]

---

[3] This contention is somewhat incongruous with Henry's modest request that his sentence be shortened to 60 months. Over the past two and one-half years it has become evident that COVID conditions are constantly changing, to include the virus's prevalence, its variants and virulence, and society's ability to respond with preventative and curative measures. Deciding whether Henry should be released five years from now because of COVID would require a level of clairvoyance

Of course, the pandemic can, in certain circumstances, give rise to an "extraordinary and compelling reason[]" for an inmate's release under the First Step Act. *See, e.g.*, *Wise v. United States*, Crim. No. ELH-18-72, 2020 WL 2614816, at *6-8 (D. Md. May 22, 2020); *United States v. Gutman*, Crim No. RDB-19-0069, 2020 WL 2467435, at *2 (D. Md. May 13, 2020). In this Court's view, the case law demonstrates that continued exposure to COVID-19 in an incarcerative setting might convert an otherwise manageable medical condition into an "extraordinary and compelling" reason for relief. However, the fact that COVID-19 is present in a correctional facility is not alone sufficient to qualify an inmate for compassionate release under the First Step Act. *See United States v. Williams*, Crim. No. PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.) ("The existence of the present pandemic, without more, is not tantamount to a 'get out of jail free' card."). Instead, relevant case law instructs that to present an "extraordinary and compelling" reason for compassionate release based on COVID-19, an inmate must demonstrate that he: (1) has a condition that compellingly elevates his risk of becoming seriously ill, or dying, from COVID-19, and (2) is more likely to contract COVID-19 in his particular institution than if released. *See Wise*, 2020 WL 2614816, at *6-7 (discussing the danger that COVID-19 poses, and collecting cases finding that "serious chronic medical conditions and old age qualify" as compelling reasons for compassionate release); *United States v. Harper*, Crim. No. 7:18-00025, 2020 WL 2046381, at *3, *3 n.3 (W.D. Va. Apr. 28, 2020) (release justified by the defendant's age, heart condition, COPD, emphysema, and asthma, coupled with the fact that the prison he was housed at had "the fourth largest number of infections among federal prisons in the country"); *United States v. Mel*, Crim. No. TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr.

---

that this Court does not enjoy. And for the reasons described herein, there is no basis for considering his immediate release for serious COVID concerns.

28, 2020) (release warranted where defendant was housed at one of the "federal prisons most profoundly impacted by COVID-19," and had a serious medical condition for which she had been prevented from receiving treatment); *United States v. Austin*, Case No. 15-20609, 2020 WL 2507622, at *4-5 (E.D. Mich. May 15, 2020) (finding that even if the defendant's petition was timely, release would be improper, even though he both was immunocompromised and had heart disease, because there were no COVID-19 cases at his prison), *appeal filed*, No. 20-1523 (6th Cir. June 8, 2020); *United States v. Shah*, Case No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020) (denying release, in part, because there were no COVID-19 cases at the inmate's facility, and the prison was making efforts to protect inmates).

Henry's medical records demonstrate that he has certain medical conditions widely recognized, several years into the pandemic, to increase a person's risk of COVID-19 complications. On the other hand, he has also received doses of the highly effective vaccines approved by the Food and Drug Administration. As best we know today, although the vaccines may only modestly reduce the likelihood of a recipient's infection, they dramatically reduce most recipients' risk of severe complications or death from COVID-19. "The availability and effectiveness of the vaccines means that '[f]or the vast majority of prisoners [it is] impossible to conclude that the risk of COVID-19 is an 'extraordinary and compelling' reason for immediate release.'" *United States v. Brown*, Crim. No. JKB-16-0427, 2022 WL 1664474, at *2 (D. Md. May 25, 2022) (quoting *United States v. Collins*, Crim. No. EKD-17-0033, 2021 WL 4991588, at *3 (W. D. Va. Oct. 27, 2021)). While this Court could conceive of circumstances in which particularly dire health conditions, especially combined with advanced age, might still result in an "extraordinary and compelling" reason justifying compassionate release of a fully vaccinated inmate, Henry is just in his mid-forties and his risk factors are borderline. This Court certainly

cannot predict with any degree of certainty what any individual's experience with COVID-19 infection might be.  However, based on the information before this Court, there appears to be no particular "extraordinary or compelling" risk to Henry from the virus.

Henry also contends that the Court should consider the effect of the COVID-19 pandemic on his incarceration.  Certainly, the country is presently experiencing another wave of infections, both inside and outside its prisons.  However, the institution where Henry is incarcerated, FCI Fort Dix, currently has no inmates and just four staff members who are infected.  *See* COVID-19 Cases, FCI Fort Dix, Bureau of Prisons, https://www.bop.gov/locations/institutions/rbk/ (last visited July 20, 2022).  Acknowledging that those numbers will likely change (and may not be entirely accurate due to the fact that there is no generalized testing), right now there is no apparent heightened risk at FCI Fort Dix.

Of course, courts have appropriately found, in some circumstances, that the generally enhanced COVID-19 risks in an incarcerative setting may be one factor, but not a dispositive factor, to consider in determining whether to grant a defendant's motion for reduced sentence.  *See, e.g.*, *United States v. Dennis*, Crim. No. RDB-08-0012 (D. Md. May 1, 2020) (acknowledging COVID-19 as one relevant factor in evaluating a motion for a reduced sentence pursuant to Section 404 of the First Step Act); *United States v. Proctor*, Crim. No. DKC 04-160, 2020 WL 1864584, at *2 (D. Md. Apr. 14, 2020) ("The current pandemic state of emergency is of great concern to the entire country ... Immediate release, however, is not a panacea ...").  The BOP's efforts to prevent transmission within its facilities have clearly presented added hardships to the incarcerated population, as the BOP employed various measures to best protect and care for its inmates.  Those conditions and risks, while unfortunate and onerous, have been experienced by all incarcerated

individuals.   Thus, in this Court's view, they cannot be deemed extraordinary in any single defendant's case, absent a more particularized set of facts.

### C.

Finally, this Court must consider whether the disparate sentence and COVID-based contentions discussed above, in combination with Henry's rehabilitation, amount to an "extraordinary and compelling reason[]" justifying further consideration of his release.  Henry has amassed letters of support from family and friends memorializing the positive changes he has made during his term of incarceration and illustrating their pledges to support him upon release.  He has documented the wide variety of educational and rehabilitative programming he has completed. And he has expressed genuine understanding of, and remorse for, the incredibly poor decisions he made as a younger man.  Henry has also provided this Court with additional context for his 2019 infraction for possessing a "hazardous tool."  A cell phone, while understandably prohibited in a prison context, certainly creates less hazard than other items presumably falling within that category.   More importantly, Henry has remained infraction-free since that 2019 offense, suggesting that he may have turned the corner on his prior disciplinary history.  While this Court commends Henry on his rehabilitative efforts and encourages him to continue on his present path, the law expressly provides that "[r]ehabilitation ... alone shall not be considered an extraordinary and compelling reason."  28 U.S.C. § 994(t).

The law does permit rehabilitation to be considered in combination with other factors that, in totality, constitute an "extraordinary and compelling" reason. *See, e.g.*, *McCoy*, 981 F.3d at 279 (combining the sentencing disparities created by 18 U.S.C. § 924(c) mandatory sentence stacking with the defendants' "exemplary prison records and other evidence of rehabilitation" to find an "extraordinary and compelling" reason).  For the reasons described above, however, this Court

ascribes no weight to either Henry's sentencing disparity or his COVID-based reasons for compassionate release. Thus, even combining those reasons with rehabilitation leaves this Court with rehabilitation alone, which is statutorily barred from serving as the basis for compassionate release.

### III.     Conclusion

In conclusion, this Court concludes that Henry has not shown an "extraordinary and compelling" reason to justify further consideration of a sentencing reduction under 18 U.S.C. § 3553(a). Accordingly, his motion must be DENIED.

A separate Order will issue.

DATED:  July 22, 2022                                         _____/s/_____
                                                             Stephanie A. Gallagher
                                                             United States District Judge